$24,621.00, $24,623.00, $24,636.00, and $24,640.00 59 Murray Enterprises at all v. City of New York Mr. Budavsky. Thank you your honor. Still good morning your honor. May it please the court. My name is Edward Budavsky, and I represent the plaintiffs in the 59 Murray Enterprises case number 24636. With me today are my colleagues Erica Dubno, who represents the plaintiffs in the 336 LLC case number 24621, and Randall Giroux, who is appearing remotely and represents the plaintiffs in the Club at 60th Street case. I'm sorry. Thank you. Thank you. Sorry. This is an appeal from an order of Judge Lyman in the Southern District of New York City, and I'm here to address the challenges to the constitutionality of various aspects of the New York City zoning resolution. With the permission of the court, I will be arguing first and addressing the tests for analyzing the 2001 amendments, including the rent and justification standards, strict scrutiny for content-based zoning restrictions, intermediate scrutiny as recently reaffirmed and emphasized in the Supreme Court's Tick-Tock decision, and the constitutionality tests from the Alameda Books decision in 2002. We have allocated eight minutes to my argument, including these introductory remarks. Ms. Dubno will then argue as to why any substantial governmental interest should be measured as of today, and will also argue the unique issues pertaining to the bookstores. We have allocated a total of nine minutes. We have the occasion. Thank you. With the permission of the court, I request four minutes, and Ms. Dubno has reserved one minute for rebuttal, and we will submit on the briefs as to any points not orally argued. Renting requires a city to prove various elements to sustain an adult zoning ordinance. The ones I want to discuss this morning are that the 2001 zoning amendments were not shown to further a substantial governmental interest, nor to be narrowly tailored. We've considered these regulations before, right, when they were adopted in 1995, right? Well, that was the 1995 regulation. Right, but you know, it didn't say, it didn't rely in any way on the 60-40 rule. No, it didn't. The decision was made in March 1998, and the guidance about 60-40 was issued in July 1998. So we said that the regulation itself, just based on the language of regularly feature, or devote a substantial portion of the business to adult entertainment, passed the renting test. So haven't we already just decided this question? No, not at all. First of all, it's whether the city is serving a substantial governmental interest, but we have decided that, that this regulation does do that. No, not at all, Your Honor, and the reason is that the 1995, first of all, 60-40 clubs did not exist in 1994 and 1995 when the prior study... They didn't exist at the time of this decision, right? That's correct. Of Busetti, of course. Yes, that's the point. Busetti only addressed 100% locations. And in fact, as I think we've explained in great detail in our briefs, the 1995 City Planning Commission report on which the 1995 amendments were based expressly excluded businesses that were not studied and expressly said that businesses that devoted less than 40% of their square footage to the defined types of adult materials and adult activities were not studied. So the 1995... You just said less than 40%. Less. They were not studied. You're 40%. No, we're less than 40%. 40% or more was ultimately defined as substantial portion, which was the phrase in the original 1995 statute, was challenged as vague and was then defined by the city as 40% or more. The plaintiffs, in our case, are under 40%. That's stipulated. Yeah, but I mean, I guess two things. One is, don't we know from the Supreme Court that the city is allowed to extrapolate from earlier studies? So we have Alameda Books where it relies on a study that did not consider two adult establishments located in the same building, and yet the Supreme Court says you can make a conclusion based on that study. You don't have to have a study that specifically covers the particular entity. And then I guess the second point would be, you know, the city has said the 60-40 rule was easily circumvented. So we looked at businesses that were real adult establishments, and we tried to operationalize that with the 60-40 rule. But then, you know, an adult establishment that just buys, or a bookstore that buys, you know, 40% of its books and keeps them in boxes in the back room so they can say 40% are not adult books, is still really an adult bookstore. And a strip club that, you know, has a billion room upstairs is still really a strip club, and it doesn't make a difference. And maybe you can say that that's not true, but the idea that the study is inadequate because these are differences in time, the argument, that begs the question, right? The city says it's not differences in time. No, what we're saying is there's no basis for the city to say that. The regulation through zoning of adult expression, historically, it must be a function of adverse secondary effects. It's not the conduct that is regulated. That would be clearly subject to strict scrutiny. So now the question is, where is the evidence in the record? And here there's none. Isn't that the point of the question about how much extrapolation is period? No, there was no... You're saying that there's no basis, and the city would say there is a basis for extrapolating... But the record doesn't show extrapolation. There was no extrapolation. There's no report that says... Can I ask, does the record support secondary effects vis-à-vis 40%? That's a given in this case... It's a given in this case... ...for the reason that His Honor pointed out. Right. The case law establishes that the 40% or more rule was constitutional, that the city met its burden. And we suggest... It's the same study that used self-reporting as an adult establishment, right? I'm not sure about self-reporting, but there was one... That held itself out as an adult establishment. Yes, there was one study, 1994, was the adult entertainment study, which then the City Planning Commission issued a report based on that and based on other evidence that it took in 1995, which established that for businesses that devoted more than 40% of their space to adult activities as defined, that there was sufficient reason based on studies in other cities, not New York, because New York was inconclusive, that there was sufficient reason to believe that those establishments generated negative secondary effects outside of the premises and there was a concentration which has been... The concentration was successfully broken up by the dispersal in 1995. So you have no more dispersal, you have no study of the 60-40 form, which means less than 40%. We don't know how much less... But again, you're begging the question, right? Because the city's position is that these are still adult establishments and the 60-40 rule doesn't adequately operationalize what the rule was trying to achieve. So, I mean, I just... We know that based on the... That the city's allowed to extrapolate from earlier studies. Your position is that 60-40 establishments are so different in kind from the adult establishments that were the subject of those studies that there's just no extrapolation to be made from those earlier studies. It's close to that. Our position is the study in 1995 expressly excluded from its scope establishments that devoted less than 40% to adult. How much less is not a subject of any report or any testimony or anything in the record. The city never experimented with less than 40%. When it was pressed on what substantial portion meant, which is what the original statute said, it said substantial portion means 40% or more. And that became the operational rule. The current statute also says substantial portion, right? For strip clubs it says regularly featured and for bookstores it says substantial portion. Yeah, but it says any. It's the same language now. It reduced it... Instead of operationalizing it with a 60-40 rule It's like a layout of the bookstores or the offerings that the club, the entertainment club... The new statute says any. It says what? Any. Not substantial portion. It says any portion. And that's the rub. You mean in the sub-provision that are attempting to block off the end runs. Because it does say with respect to adult eating, drinking, other needs to regularly featured adults. Right, in any portion. So you're saying the earlier position was you have to regularly feature and a substantial portion has to be devoted to it. Now it says if you regularly feature adult entertainment in any portion of your establishment, you're an adult establishment. You're saying that is a very significant... Yes, it is significant. And we acknowledge... But the position is it's not that significant because if you regularly feature adult entertainment but you just have an upstairs billiard room that occupies a lot of floor space, you haven't really transformed the nature of the establishment. But we have... If you believe that, you can extrapolate from the earlier study. Yes, but we asked the court in its independent review of the record to recognize that Justice York in the State Supreme Court expressly found in detail that 6040s did not cause adverse secondary effects and those findings were affirmed by the appellate division. And under New York procedure, the Court of Appeals, unless it finds an error as a matter of law, has no jurisdiction over affirmed findings of fact. Those are the affirmed findings of fact in this case. Matter of record. And the ultimate conclusion from the New York courts was that that was not accurate, right? No, the ultimate conclusion was it didn't matter because of the continued quote-unquote focus on... I'm paraphrasing. They used the word focus. The focus on adult entertainment. They slid off of secondary effects and they based their decision on the adult entertainment in the interior of the premises, not the secondary effects. And the fallacy in that, among many others, is that in 1980, the New York Court of Appeals in 1981 in the Belonging case... That's not a mistake, right? Because the question here is what's going on inside the establishment so different in time that you can't conclude that it had secondary effects based on the earlier study? Well, there's two things. One is the New York Court of Appeals only had the New York constitutional issue before it, not the federal constitutional issue and wouldn't have jurisdiction over the federal constitutional issue. But it wasn't presented in any event. So the federal constitutional question, which requires the application of Renton and Alameda books and all of the other cases that have been cited, the many, many cases that have been cited to your honors in the briefs, is what is before this court. And under the federal test, it's secondary effects that have to be looked at. I think we have that argument. Why don't we hear from the next appellant? Thank you. Thank you, your honor. Doug Dunn. Thank you, your honor. Is this okay? All right. Thank you, your honor. May it please the court, whereas here there have been significant changes since the enactment of an ordinance, a zoning ordinance that restricts establishments that offer free expression, courts can and should consider whether the ordinance is still needed. This is a legal issue that this court should consider or can consider de novo. Mr. Rudofsky was talking about... We need to decide whether it's still needed. So like in the city of Renton itself, there weren't adult establishments in the city yet, but the court says you could prophylactically enact an ordinance to prevent the secondary effects that we expect would happen. So if, in fact, New York isn't experiencing the same secondary effects it did 20 years ago or more, maybe it thinks it might come back if we don't enforce the regulation or maybe it just shows the regulation is working and we should make sure we keep up with the time to some extent. So why isn't the city allowed to do that? Your honor, this is a very different situation than in Renton. In Renton, there were no adult businesses when the city of Renton enacted its ordinance and they said, you know, we can consider and we can experiment and things like that. And significantly in the TJS case, this court looked at Renton and said that Renton is looking when an ordinance is actually being challenged, the court actually looks at it sort of as it is being applied now and that, back at the time, that may be a facial constitution there and we're not saying that this is not also a facial constitution, but it was sort of active. You mean you're not you mean you're making the facial constitution a challenge, is that what you mean? Yes, your honor. I know that the, I believe that the plaintiffs, I represent the bookstores, I believe we raised both an as-applied and a facial constitution. I'm not sure about the clubs, your honor. But here, when I'm talking about as-applied, I'm not talking necessarily about as-applied to the businesses, the specific plaintiffs. I'm saying how the law is being applied right now and what the effect is on free expression. We're not in a situation where, I mean, that the city's experimenting. These businesses have been there. They've been operating for 30 years, some of them. And you have a law that was enacted in 2001 based on studies that were conducted in 1994. That's 30 years ago. I think the TJS study did act, you know, between 1994 and 2001, which is only seven years. It's just that litigation has led to the extent of the long period of time since then, right? Your honor, even, I mean, are you saying it's possible that there was a real problem the city was addressing in 2001 but because of the length of litigation it suddenly became unconstitutional? No, your honor. I'm not suggesting that at all. But what I'm saying is even if the law had been enforced back in 2001, I mean, here it has not. It has actually been stayed. You know, it's dusty and stale. But, your honor, the TJS case says that the issue is not whether the law has been enforced or not been enforced. The issue is whether or not there has been a substantial and significant change in the circumstances. And in TJS they said, and they were only addressing the second prong, which is alternative avenues. But, we believe... But where are you making this argument, doctrinally, the argument that the studies are stale and don't tell us what, about the existence of secondary effects now? And where doctrinally are you placing that argument? I mean... What step? Under the First Amendment. I mean, I'm not sure I understand. You mean that the city can't show it has a substantial interest? Substantial governmental interest, yes, your honor. So it's prong two. I'm sorry, it's prong one. You have substantial governmental interest, and then you have adverse secondary effects. I'm sorry, alternative avenues. I apologize. In TJS the court only addressed alternative avenues, but the logic underlying TJS is very clear. Whereas here there have been substantial changes in the facts, the courts cannot shut their eyes to reality. Okay? Why is that an inescapable conclusion? I mean, it seems like when the court our court previously and the circuit court addressed this, they're talking about a substantial government interest in the abstract. This is a thing that the municipal government can address. They don't require them to show that it's actually happening right here and there in the city because, as you pointed out, in the city of Brinton there weren't adult establishments there at the time at all. And they're certainly not requiring an annual conducting of the studies, right? We're not suggesting there should be an  conducting. What we're saying is that the world has changed so much that you can't even extrapolate from the experience of other studies and all of these studies that were conducted in earlier times are unreliable and there just aren't these secondary effects anymore and we just have no idea and so they're just too stale for anybody to rely on. Yes, Your Honor, we believe it is unreasonable to regulate pre-expression today based on studies that were conducted of entirely different types of  back in 1994. So is the problem the change or the  The change,  And what is the triggering mechanism for how much change is so much that it becomes unreliable? In the T.J.S. case, the court, I think, said substantial or significant change. They didn't define, I don't know, it was not defined in T.J.S., but the court adopted that test there. And if you don't know what it looks like, then how do we know it's been met here? What I can tell you is that the Internet sort of came in here in between.  The world is very different. During the  administration, zoning in New York changed, I believe, 40% of all the zoning in New York was changed. The reality is the  establishes that there  is a      understand, just as a logical matter,  if you have studies that say adult establishments produce secondary effects for, let's say, increased crime or decreased property values, and that is a  interest. That's the way you use the study for purposes of that. It exists as a  effect, which is a substantial interest. Let's say as a result of the Internet, you have fewer businesses that have adult entertainment because people get that on the  Is that the idea? Presumably that has led to a reduction. So maybe you have less crime and you have less decrease in property values, but you would presumably still, as a logical matter, have a substantial interest in further reduction of crime or further stating off decrease in property values. With respect to whether there is a reduction                            in property values, I think there is no way to dispute that the Internet has transformed the delivery of adult content. But why does that mean that the secondary effects that were identified in the earlier studies are    not  applicable? So is the idea that because lots of people receive adult content over the  it's a different population that is congregating around adult establishments, you would have less crime? Or a tipping point, like you need a certain number of them before you start having the secondary effects? We're not saying that the Internet is responsible for all the issues here. The record establishes that the businesses have fundamentally changed. The substantial change is 60-40 establishments versus adult establishments simply. Is that the substantial change? We're not   It's just not. As recognized by Judge Pauly, the reality that the city once recognized and believed to exist no longer exists. And in TGS... It is true, you wouldn't dispute that the city has a substantial interest in combating crime, urban decay, these things. What you're disputing is a causal relationship between adult establishments and those substantial interests of the city, right? Even though there is a study that shows a  between adult establishments and those  you're saying something is very different now, that we can no longer rely on those studies to show that connection. I'm asking, what is the difference? I said, is it the  You said, we're not relying on the internet. Is that a significant change? As I indicated, we don't believe there's one specific change. The city always has a police department     crime and increasing property values. We're not saying it. We're just saying that the businesses that exist right now are not responsible for it. We've had evidence that was submitted Maybe I'm trying to put things into many boxes, but isn't that a tailoring argument, as opposed to whether there is a substantial interest? That is to say, aren't you saying that you're not meeting those This doesn't sufficiently meet those It's under inclusive or over inclusive with respect to trying to meet those ends? I'll address that in a second relating to the definitions that were amended there, especially relating to bookstores being narrowly  You have a situation here where they are trying to say, 30 years ago there was a  ergo there must still be a problem today. That is simply not when you are dealing with free expression, when you are dealing with people's property rights You say there was a  but the  doesn't require us  that there is a  The analysis requires us to determine whether the government is pursuing a substantial interest. You acknowledge that there  substantial interest in combating crime property values and other things. The question is not whether there really is such an intolerably high level of crime or whatever. The question is whether when they are regulating these establishments they are in fact furthering their interest in reducing crime and   The question   still has an interest in keeping it low and further reducing it. So if there was still a correlation between crime and health establishments it would be serving an interest. Are you saying that some level of crime a city is required to  because of the First Amendment and   has to be some kind of reasonable correlation between the businesses that are being regulated and the harm that the city perceives exists. And whereas here you have changed signage, you have mixed uses, you no longer have a concentration, you have an entirely different type of clientele coming in, the record establishes that other people are coming in to the bookstores there, people are buying different things, where things have been changed, there are significant differences. I do think the signage issue is a change, but the other       strip club that has some amount of its floor space upstairs devoted to a non-adult purpose. There's still a strip club, but there's no reason to think it's going to have different effect than the one that does not have that. Why is that an impermissible extrapolation from the earlier studies? Your honor, because when the city did its analysis in 1994 and the city did a city planning study, what they said was we are only looking at certain types of  That gave rise to the 60-40 rule where they said places that don't have the concentration are not adult and should not be regulated. In this situation, the city amended its law in 2001 without a basis. You cannot just keep changing things where the city recognized that they needed to narrowly  narrowly narrowly the       prohibit multiple adult establishments from being co-located in the same building. The Supreme Court says it is allowed to extrapolate that having two different storefronts is not different from having two businesses behind the same storefront. That inference doesn't seem so obvious to me. It seems to me two different storefronts occupy more of the block. The Supreme Court said you can make that inference. Isn't here the city making even less of an  The city is talking about replacing a rule that is not a    with your honor that an issue is narrow tailoring. Whether you are tailoring this law to affect things that are actually causing adverse secondary effects, you have a history of 30 years where businesses have been trying to open an operation. You can't close your eyes to the reality of what is there. That is what TJS is saying. It governs the first prong. The bottom line is you don't need a lot to restrict expression. It can't be in perpetuity,   I have two other things. I want to point out I noticed I had a typo on page 34 line 7 of the brief. I indicated that legislatures must ensure that laws speak to current conditions. I'm of the court obviously. I want to speak briefly about issues specific to the definition of  bookstore. It is basically the same thing. They kept substantial portion. For the bookstores they kept 60-40. Focusing on the concentration. The eight sham factors have nothing to do with any reasonable belief that they cause adverse secondary effects. It is very clear whether a bookstore rents or sells videotapes. They are purely reactive to decisions that the city lost. That came directly from the case. There was an issue and they said it was a bookstore. It offered adult videos for rent and sale. The New York court of appeals said it doesn't have a sham factor. It has nothing to do with  There is nothing in the zoning ordinance that deals with the operation of a bookstore or any other type of use. Zoning deals with the heights of  This is about deciding whether something is actually an adult establishment or is circumventing the 6040 rule. If you have a large stock that you operate as a video rental place but you have in some other room some tapes you are selling, the idea is we are getting at what you are genuinely about and why customers are coming to the store. That is the argument. To the best of my knowledge there is no other use of the 6040  The 6040 rule is about internal factors. It is about what the stock is that the store keeps. Your Honor, when the city enacted the 6040 rule and they established the definition of adult establishment and adult bookstore being focusing on floor space and stock, those were objective factors. And the reason is the zoning resolution is enforced by building inspectors. So now under these amended definitions you will have building inspectors coming in and determining whether or not looking at the titles of books you will have building inspectors make decisions about what the title of books                  inspectors     not making decisions about what the  of a book should be. And the reason is that the zoning resolution          decisions about what the title of a  should be. And the    zoning resolution is enforced by building inspectors making decisions about what        the title of a  should be. And the zoning resolution is enforced by building inspectors making decisions about what the title of a   be. And the of a should be.  the what the  of a should be. And the zoning resolution is enforced by building inspectors making decisions    about what the    be. And the       inspectors       should  make decisions     inspectors      of a should     be enforced by building inspectors        be. And the    enforced by building be. And    is enforced by building   inspectors       should be.            about     what the title            inspectors making decisions about what the  of a should be. And the   is enforced by building what the title of  be. the title of be. And the is inspector    inspectors     be. And   approach      them   you can't just put in a fake billiard hall upstairs where they were doing private lap dances. It was supposed to apply to strip clubs and it was court decisions that decided they get the benefit of a substantial amount of money. I think the original law that regularly feature adult entertainment to evade regulation based on a physical real estate space. And that was I would say not intended.  not. This is a point that I made before. When I go back and read which we decided before the 6040 regulation came out. We talked about regular features. Based on that there doesn't seem to be any kind of reliance on 6040 rule of law space. There must be a lot of ways to operationalize these standards. But we think the standards are consistent. I think that's right. I think what happened is the operationalization of the law came from a challenge about its vagueness in state court about whether or not the zoning regulation was consistent  the  rule of  I don't  it's consistent with the 6040 rule of  It's not  with the 6040 rule of law. It's not consistent with the   6040       to produce the same secondary effects. I understand your argument to be that the studies for the  of the 2001 amendments or the study establishes circumvention of the prior rule and that coupled with the 94 studies give you show what you showed the existence of secondary effects vis-a-vis the circumventing I think that's right and then I'd add first that many of the very same businesses that were studied in 1994 were the ones who were studied as sham businesses in 2001 rather than relocate and comply reconfigure their spaces so they had the same secondary effects because they were the same businesses with the same predominant focus on sexual activity they had before.  just maintained the same focus on     by those 1994 studies which then in turn relied on studies from across the  which in 2001 referenced additional studies from across the  about the negative secondary effects I think it's beyond dispute that sex shops have negative secondary effects and that allow them to be subject to zoning regulations that will tell that across the country we're allowed to do that and in fact I would think that if we were to say that none of those studies are sufficient to support this law we'd effectively be saying that no jurisdiction across the whole country can have these laws and that is contrary to what the Supreme Court has held. First of all it's just not how laws are done. We don't call upon the government to resubstantiate  its laws on an ongoing basis and that's because until at least a plaintiff can come forward we're not in that world. You were about to say until the plaintiff comes forward with contrary evidence. Do you think that is an appropriate part? I think that burden is too low. I would think it would have to be pretty significant and I don't think that the current doctrinal set up allows for that but that's just not this case. The way the law is set under White River you look at the pre-enactment evidence of the government interest and under TJS. There have  changes in New York City since they were enacted. They're saying that is the crux of their case. This looks differently than what it was in 2001. Where does that fit into your analysis? This court addressed that in TJS and the place that fits into the doctrinal set up is the outer ambit of the   This is akin to a time place manner restriction and the question is whether there are adequate alternative locations. That is a factor that can change over time. You would not disagree that if the city passed an  saying that all adult businesses had to be located in a borough other than Manhattan, that would be problematic, right? No, I would not, because I think that's kind of what zoning law is all about. Zoning law is all about identifying locations where things can be and things can't be. I would say given the way that New York City is run, I don't think that's a very reasonable way to do things, but what this court said in Hendrickson is that we don't do a borough by borough analysis. New York City is zoned as a block of five boroughs, and if the determination was that something unique about, I mean, if we said that there couldn't be any lumberyard in Hickerson, and in the central business district, I mean, think about other communities outside of New York City. If they say you can't be in the central business district, that's pretty much the law in most other municipalities across the country. Those laws are permissible because there are adequate alternative locations, and courts presume, and I think the Supreme Court has said, that you expect people will be willing to travel out of the core business district or out of the school zones and into an industrial district, given the draw of adult businesses. That's not a presumption we're allowed to have, and it's kind of inherent in zoning. So, I guess I'd push back on saying a law that identifies any area as off limits for this type of business, so long as there are adequate alternative locations, would be problematic. I don't think that would be a popular or plausible law. A moment ago you quoted the Supreme Court as saying this speech is at the outer end of the First Amendment, so that implicates the discussion I had with Mr. Garreau, where he was saying it gets the same protection, so we should apply the same standards. Do you think that's not an  assessment? I don't think that's an accurate assessment. We don't talk about other types of speech in terms of negative secondary effects. It is a unique area of the law that is fairly well developed.  think this issue is something the court is likely to address in Paxton? The question about the secondary effects doctrine or specifically the zoning regulation of adult businesses. I think there is a unique aspect. Are they going to talk about whether this kind of content, how it's generally treated, the meaning of Alameda, does any of that seem likely such that the cities have the view that we need to hold? I don't think so. I can't predict what the court will say. The questions about secondary effects are different. We are talking about the municipality acting as the apex of zoning. Zoning laws are about regulating where different businesses can be located. It's about allocating space. The question about whether a secondary effect allows us to place it in one  a zoning question. The fact that these businesses happen to... If we were not convinced that you really were focused on the secondary effects and you wanted to build businesses out of the city, that would be unconstitutional. That would be a zoning question. You are normally allowed to put certain specifications on the zoning question. You       Alameda and the renton standard already has that inherent in it. Which is a total ban. This is a completely different question. When you have the first amendment protections they are not being regulated because of their first amendment conduct. They are being regulated because of their secondary effect. When you are regulating for expression we do worry about  the government is not doing their job. The first amendment   even   law. It is grafted on to pre-existing first amendment law. Looking at and reading renton and Alameda books it is clear this is an area of the law that is well developed that is  across the country that allows municipalities to have zoning regulations. There are arguments whether read or other cases where the court has talked about other types of secondary effects. The consensus is those don't change the renton and Alameda standards. The court has been clear about how the first amendment is a complicated area. This is a standard that applies here. It is a well  standard. The first amendment is  from other types of speech. Because what we are talking about here is a commercial business that is engaging in selling a subset of speech that also has well documented negative secondary effects. It is because of what is going on outside as a result of what that business does. Prostitution, pornographic litter,  a reduction in property values. People don't want to live next to that business. What about the house speech will care test? Do you agree that Joseph Kennedy altered the law  it is the narrowest decision? It says the narrowest grounds that a majority of the justices met on becomes the controlling laws. I think that is a mistaken assumption there. I think the 11th circuit really clearly addressed that. To the extent you read Kennedy's gloss no other justice signed on to that. That is not what it is. The place where his vote and the four justices who were signed on the concurrent coalesce is they all agree that intermediate scrutiny  There is no heightened intermediate scrutiny. Intermediate scrutiny applies. I suppose you have to read Kennedy's word. I think what he is saying is he is speaking to step two.  might be that Kennedy says regular intermediate scrutiny. I don't see that in the concurrence. I want to speak to two issues separately. I want to speak on step two. Do we go to intermediate scrutiny or strict scrutiny? He does not purport to be talking about what is     can't see how you get there, but if you read the opinion and take a step back, it seems to me that he is doing the analysis. Whatever you make of how speech was called proportionality seems to be how he is evaluating whether or not the regulation survives. It doesn't seem to indicate that you then go on and do something else after that. If that's right, I understand the city's argument to think of it  If that's right, then under Marx, is that the whole thing that fine? I still don't think we have five justices on that. To the extent we're talking about the narrowest grounds you can get out of Alameda, I don't think there are five justices on proportionality. The very last paragraph of Alameda of the concurring opinion of the four justices literally says that they're rejecting any view of justice Kennedy suggesting something like proportionality. They think what he's doing is consensual, which is why he doesn't have a majority. So that can't be the narrow extent. Right. That's my point. You cannot read that paragraph at the end of Alameda plus justice Kennedy's concurrence and take from it a proportionality test specifically because four justices basically rejected it. But even if we were, we still win. Which is why it sort of seems like an exercise in... Which is to say all the proportionality test in that case is if you were to accept it and very clearly I don't think that's correct, but even if we were to accept it, it basically dovetails with what this court says. Does the government have a reasonable belief that speech will have an alternative location. Is there an alternative location for this speech to take place such that the speech will fare poorly. And what we're saying is there are 1,275 alternative laws available to these businesses. So even if every single one of them decides they want to speak at 100%, they want to speak 100% adult businesses. That is the core of what they want. They have an idea that what justice Kennedy is asking us to do is to have the court continually reexamine whether or not there is enough venues for speech, how it will fare. We still have done that. Which is why it's kind of an abstract and maybe unnecessary question to reach. I guess one question is is it a little bit more searching? Is it doing something more searching than intermediate scrutiny such that the question of commercial viability does enter into it? I think it's a version of the argument. I mean, I think that that is just precluded by the Supreme Court's  decision. So I just think you can't do that because in Renton the court was very clear about how you don't look at that space. In Alameda they said that this court examines exactly that and explains why it doesn't really work because as a practical matter you would be calling for a mini trial on all 1,275 alternate locations. They say that that location is 12 blocks from the  We say people in that neighborhood walk 17 blocks to get to the subway. It's not a functional way of looking at the constitutional question. Is this a place, a marketable location where businesses could go? They say the current owner doesn't want to sell it to me. That cannot be the constitutional test for whether or not there are adequate alternative venues. I think that would be disruptive of the general time, place, manner doctrine outside the adult use area. We don't talk about what is a person's favorite or alternative location. We talk about the availability of alternative locations. We do evaluate whether it is equivalent to the place that the city wants to put them. If they want to protest in front of city hall and you say no, time,  manner and place,  right next to a school. You are between a school and a church. You cannot put a strip club here. Here is an alternative location. What the affidavit from the general counsel explains is that I can tell you where in the record it is. It is a hard assumption. It explains each of these locations. It doesn't go through all of them. They are in vibrant areas. They have a geographic mapmaker model the city in alternate locations. These are not just random lots. They consider proximity to the subway. Whether they are in areas where people generally go, there are already businesses. People are already traveling. They are outside of  areas. If you wanted to have a protest in a residential neighborhood, we couldn't say you have to have that protest under the bridge over there. That is not an apple to apples when we are talking about reasonable alternative locations. There is no question that you don't do commercial viability as a question. What the city did in its proof here is show these were alternative locations. Not just  Alternative locations to relocate. They had a discussion about how there could be crisscrossing of highways and it was still qualified. We disqualified locations like that. We heard that the mandatory termination provision presents different issues from the definition      zoning law. It does not. There is a couple of things about that. Mandatory termination provision is a function of the zoning law. I don't know what is the constitutional question they are trying to pose under it. I think the question is if it were true that we have to evaluate whether the city is restricting more speech than necessary to advance its interests, maybe it shouldn't force the existing businesses to close down because going forward if you restrict new businesses you might accomplish the same interests. There might be a reason for that. I don't think there is a constitutional doctrine that requires us in our zoning resolution to require grandfathering. I think the place they try to put this is they say they have a vested property interest under New York state law. New York state law is a question about whether businesses have adequate time to  Prior nonconforming uses under state law this isn't like a constitutional vested. Under the state zoning rules the law has to be made in a way that people have an  opportunity to recoup their investments. The    here because of over two decades that this law has been not enforced they have had two decades of time to recoup many losses. The vast majority of   constitutional implications. Let's say the city said after the new rule comes into effect you must relocate within five minutes. It is impossible to do that and it forces them to close down. That would raise issues wouldn't it? That would be a procedural due process challenge where we would there are laws that require immediate there are such things that are immediately required to cease. There is a whole doctrine under New York state. There has to be alternative channels of communication and we think the way you are enforcing it is going to prevent the relocation and those alternative channels from materializing. That would be part of the analysis. That is pure speculation. We have quite a long section. To the extent that this is pushed into a prior restraint type of doctrinally. That is the closest thing. The grandfathering clause is so short and the city's administrative apparatus is so unwieldy we could never expect to relocate. That is not proven out by the record. It is completely speculation. The fact that the city has a fairly robust administrative scheme and the availability of article 78 review which means we couldn't act in a capricious manner closes the door on the first amendment problem. There is a possibility that I could create in my mind that would for not having grandfathering be problematic but this is the         20 years later. Most of these businesses came to the location knowing this was a law that was currently stayed.  stayed. They didn't have to do anything. They didn't have to do anything. They were operating during that time. As a question of New York state law they did have it under how the state viewed their property interest. If you read the preliminary injunction decision here, judge Pauly agreed with everything that the city is saying today. The only basis for the P.I. was that he wasn't certain there was sufficient proof about the alternative locations in the outer boroughs. Here we are several years later after a full trial on this issue. The idea that that period of time that people could come to a new location   bothered as a result that there was a P.I. in place and so the law wasn't suspect, I think it kind of blinks reality. Can I ask the  they have an address, but I want to get this. The prior restraint question with respect to the permitting provision that has no time frame as I understand it. No time limit for the issuance of the permit. We do have case law that suggests that that can operate as a prior restraint. I understand the district court said because they haven't applied for the permit there's not standing and I think you make a  argument as to this. They didn't in their opening brief challenge that standing conclusion and instead they seem to be making kind of an argument that the argument being that we're not actually challenging permitting provision, but if we can't if that's a prior restraint and we are mandatorily terminated then it's a prior  Given that there's something to the permitting issue I wanted you to give an opportunity to address it because I think SWPBS does seem to indicate that the lack of time limit for issuance of a permit might constitute a prior restraint. I think a few things. I'm going to try to do a few   I will putting aside that I object on a standing basis on the fact they didn't raise it and I don't really understand how they can back their way into an  but putting that aside is the merits of this argument. SWPBS basically said that you should have time a system in which the government has no limits at all on what it does is no time limits at all allows it to basically operate like a censorship scheme. Here the administrative code requires us to act on their building application within 40 days. Then they have an  building application. What they are saying is that there is the potential for them to be holding an  building application and to go to the front desk and be like I have an  building application issue me a permit. For that they have to show that they have insurance and they have a contractor. There is a list of requirements in the administrative code. I don't want to say rubber stamp. There is the time limit. There is no time limit. There is no evidence that that has ever taken more than the time limit. There is a time limit for evaluating the application. That should say the approval shall issue if you meet the requirements. If you have an approved application you are entitled to a permit. If the  withholds an action you can file an  78. I might have missed one basis for you saying yes. There is a time limit for review of the application. They submit their application for their zoning and siting application. The city has 40 days from the submission of the complete application. To issue their decision on their application. They get a building approval. They get approval to engage in construction. They need a permit to break ground. Those permits depend on  insurance and things unrelated to them at all. This is a generally applicable rule for all construction in the city. You have to get building permits. This is different than getting approval. Now they have an approved plan to build and they just need the physical permit to tape on the door. That physical permit, that shall issue once they meet those requirements. It's kind of a feigned issue. There's no claim. It depends on them getting insurance and meeting the requirements. They still refuse to get    That would be unlawful. Absolutely. I think also that just backing into that, I wouldn't want to leave unsaid that FWS, there's a whole bunch of cases that come afterwards that make clear the availability of state review like article 78 is sufficient to address that question about a prior restraint. Even just the availability of article 78 means it's not limitless. It's not a state apparatus with no opportunity to review. It's part of a large administrative arm that we move through on a regular basis. It works well and people get their permits on a  basis. This is just another feigned issue. Thank you. Thank you very much. We'll turn back to Mr. Radofsky on rebuttal. Thank you,  Let me try and unpack some of these arguments almost in the reverse to the way they came up. With regard to standing on permitting investing, our argument is not a standalone argument that the permitting investing provisions are unconstitutional. It's that the  termination provisions are unconstitutional for a number of reasons, including the defects in permitting and investing that we've laid out in the briefs. But then you need to say in your opening brief that the district court misconstrued our argument as a standalone challenge to permitting investing. We don't believe so, Your Honor. The opening brief says what it says, but we certainly have made the argument in the opening briefs that the mandatory termination provision is unconstitutional for a number of reasons, including the  investing problems. And certainly the plaintiffs laid out in their declarations which were undisputed all of the reasons why the problems in permitting investing would prevent them or chill them from moving, which is one of the relocating, which is one of the most important considerations in connection with mandatory termination. We seek an injunction against the  termination provision until the problems are resolved as a one of our clearly one of our arguments that we made throughout. Secondly, with respect to mandatory termination, the city's argument is fundamentally wrong. Mandatory termination uniquely imposes severe burdens on adult uses as compared to virtually all other uses, most of which have some adverse secondary effects, which is why they are zoned out of their current locations without showing any sufficient need for the drastic discriminatory treatment, both in terms of the amount of time to relocate and the requirement of doing away with the general proposition under New York law of grandfathering, which has been the traditional view, that if you were legal and you become illegal, you get to stay where you are. You can't reopen and there are certain restrictions on what you can do with your property, but you don't have to change your use and you don't have to move. So all of that augurs in favor of a finding of unconstitutionality here and would impact the public's response to expression. Now, with respect to that, if I may, with respect to the discussion about proportionality and Alameda Books, if the court looks at the district court's decision in Alameda Books and the Ninth Circuit's decisions, and there have been a series of them, they have carefully parsed Alameda Books and they have concluded that, number one, that  Kennedy added a test and that,  his concurring opinion in Alameda is under marks the controlling and Justice Kennedy emphasized over and over again proportionality as a new test, something new and different before a zoning rule could be enforced against First Amendment expression and that is at the heart of what we are arguing here. The city has the burden. We are the plaintiffs but it is a constitutional claim and they have the burden of justifying the constitutionality and if you apply Renton as modified by Justice Kennedy's concurrence in Alameda and apply the burden shifting that Mr. Redofsky     a modest technical as it was called at the time. I think we have that argument. Thank you very much Mr. Redofsky. I just want to note your Honor if I may, you asked what are the changes since the first of all, the 1995 law is what solved the problems and that is what is in effect. The 2001 law never took effect so it hasn't solved anything. And what has changed? The number of adult uses has been reduced dramatically as Mr. Giroux explained. The uses on 60 40 are mixed uses. Some may be offensive. Some club at 60th which is one of the plaintiffs built a  steakhouse. Many people have that argument. Thank you very much  Redofsky.  hear from  Thank you your  The city concedes that a law can be advocated. We say that that is the case here. First of all, this law talks about renting slides. In addition to that, the record establishes that property values are up, crime is down. I'm not even sure what pornographic litter is. The city says that the challenge was brought in state court. It was the Hickerson case. The city says that zoning is the apex of police power. In the next case, zoning power is not unlimited and must be related to public health safety and  The city says we're talking about favorite locations. There's actual alternative locations. This includes a lot of over 7 million square feet in western Staten Island. It's three times the size of Grand Central. Relating to the question of equitable estoppel and whether or not consideration should be done when the law is stayed, we urge that it is. For much of the time, the law was struck down. We urge that current burdens must be justified by current needs. We refer the court to page 26. There the court lays everything out. They say because of the first amendment implications, consideration must be  We urge    change in the community that the burden could be put on plaintiffs. They claim that if you have any other attorneys . They talk about that we should avoid an absurd result. We urge that this is an  result. Thank you. Thank you very much. The case is submitted.